UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/21/2023
```

CARL ZEISS MEDITEC, INC.,

                            Plaintiff,

-against-

INSIGHT PHOTONICS SOLUTIONS, INC.,

                            Defendant.

20-cv-7667 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Plaintiff Carl Zeiss Meditec, Inc. ("Plaintiff" or "Zeiss") brings this action against Insight Photonics Solutions, Inc. ("Defendant" or "Insight") (together, the "Parties") alleging (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; and (3) contractual indemnification (Amend. Compl., ECF No. 52.)

Presently before the Court is Defendant's Motion for Summary Judgment as to all claims. (Def. Mem., ECF No. 61.) For the following reasons, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    FACTUAL BACKGROUND

The facts below are drawn from the Amended Complaint, Defendant's Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 ("Def. 56.1," ECF No. 63); Plaintiff's Response to Defendant's Rule 56.1 Statement pursuant to Local Civil Rule 56.1 ("Pl. 56.1(c)," ECF No. 68), including Plaintiff's Statement of Additional Material Facts ("Pl. 56.1(b)"); the

Parties' declarations;[1] and corresponding exhibits.[2] All rational inferences are drawn in the non-moving party's favor.

### A.  The Parties' Transactions Pre-2017

Insight develops lasers for various uses in different fields. (Def. 56.1 ¶ 1; Pl. 56.1(c) ¶ 1.) Zeiss is a world-leading company that develops medical devices. (Def. 56.1 ¶ 2; Pl. 56.1(c) ¶ 2.) The Parties initially contracted in 2013 for Zeiss to fund Insight's initial development of 1060-nanometer-wavelenght laser chips meeting certain specifications (the "Zeiss Project"), which sought to solve a very difficult technical problem. (Def. 56.1 ¶¶ 3-4; Pl. 56.1(c) ¶¶ 3-4.) In 2014, the Parties signed a Development and Supply Agreement ("DSA") wherein Insight agreed to (1) "develop and manufacture and supply exclusively for [Zeiss]" lasers for ophthalmological uses; (2) use "best efforts" to develop lasers meeting certain specifications; (3) "keep [Zeiss] advised of the progress of such development," including any "material problems"; and (4) if the development

---

[1] The Parties' declarations include: Declaration of Paul H. Schwartz in Support of Defendant's Motion for Summary Judgment ("Schwartz Decl.," ECF No. 64); Second Declaration of Paul H. Schwartz in Support of Defendant's Motion for Summary Judgment ("Second Schwartz Decl.," ECF No. 72); Declaration of Matthew W. Wester in Support of Defendant's Motion for Summary Judgment ("Wester Decl.," ECF No. 65); Declaration of Douglas Zahn in Support of Defendant's Motion for Summary Judgment ("Zahn Decl.," EXF No. 66); Declaration of Roberto Deger in Opposition to Defendant's Motion for Summary Judgment ("Deger Decl.," ECF No. 69); and Declaration of Daniel P. Goldberger in Opposition to Defendant's Motion for Summary Judgment ("Goldberger Decl.," ECF No. 70).

[2] Citations to "Def. Ex." Refer to the Exhibits attached to both Declarations of Paul H. Schwartz in Support of Defendant's Motion for Summary Judgment. (ECF Nos. 64, 72.) Citations to "Pl. Ex." Refer to the Exhibits attached to the Declaration of Daniel P. Goldberger in Opposition of Defendant's Motion for Summary Judgment. (ECF No. 70.)

Citations to the Deposition of Angelo Rago ("Rago Tr.") refer to Def. Ex. A and Pl. Ex. 7. Citations to the Deposition of Roberto Deger ("Deger Tr.") refer to Def. Exs. B and L and Pl. Ex. 1. Citations to the Deposition of Douglas Zahn ("Zahn Tr.") refer to Def. Ex. 2.  Citations to the Deposition of Michael Minneman ("Minneman Tr.") refer to Pl. Ex. 6. Citations to the Deposition of Tillman Schmoll ("Schmoll Tr.") refer to Pl. Ex. 9. Citations to the Deposition of William Watson ("Watson Tr.") refer to Pl. Ex. 10. Citations to the Deposition of Matthew Everett ("Everett Tr.") refer to Pl. Ex. 11. Citations to the Deposition of Jason Ensher ("Ensher Tr.") refer to Pl. Ex. 26.

were successful, manufacture and supply lasers to Zeiss. (Def. Ex. I at Recitals 4, §§ 2.1, 2.2 & art. 4; Def. 56.1 ¶ 5; Pl. 56.1(c) ¶ 5.) By early 2017, Insight was able to demonstrate a laser with a 100 kilohertz source on occasion for only a few minutes, but without the significant functionality it promised. (Def. 56.1 ¶ 6; Pl. 56.1(c) ¶ 6.)

### B. The Parties' 2017 Transactions

#### i. *Purchase Agreement*

On February 24, 2017, the Parties restructured their relationship through a series of transactions (the "2017 Transactions"). (Def. 56.1 ¶ 7; Pl. 56.1(c) ¶ 7.) In the first transaction, Zeiss purchased 52% of Insight's subsidiary Ophthalmic Laser Engines, LLC ("OLE") pursuant to a Limited Liability Company Interest Purchase Agreement (the "Purchase Agreement"). (Def. 56.1 ¶ 8; Pl. 56.1(c) ¶ 8.) The Parties agreed to a purchase price of $15,028,00. (Def. Ex. D § 2.02.) Pursuant to the agreement, the "purchase price was calculated as $19,500,000 minus the product of $8,600,000 multiplied by 0.52."[3] (*Id.*) Both Parties executed the agreement, and Insight conveyed 52% ownership to Zeiss, with Insight retaining 48% ownership. (Def. 56.1 ¶ 10; Pl. 56.1(c) ¶ 10.) The Parties referred to OLE as their "joint venture" or "JV." (Def. 56.1 ¶ 15; Pl. 56.1(c) ¶ 15.)

At the time of Zeiss's purchase, OLE had no operations. (Def. 56.1 ¶ 8; Pl. 56.1(c) ¶¶ 8, 13.) Because OLE was an early-stage company with few employees, Zeiss and Insight decided that OLE should not hire administrative staff to prepare its monthly financial statements; perform human resources, payroll, and IT functions; or handle shipping and receiving. (Def. 56.1 ¶ 25; Pl. 56.1(c) ¶ 25.) Instead, in its budgets, the OLE board approved OLE making "G&A Resource" payments to Insight to compensate Insight for having its personnel perform administrative

---

[3] The $8.6 million refers to the initial capital contribution agreed to by the Parties for OLE. *See infra* Section B.ii.

functions on OLE's behalf, as well as to reimburse Insight for OLE's proportional share of utilizing Insight's arrangements with its payroll vendor (ADP); 401(k) provider (Vanguard); liability and health insurers (Sentry Insurance, United Healthcare), and telecom providers (CenturyLink, Nitel). (*Id*.) OLE's G&A Resource payments totaled $426,025 over three years. (Wester Decl. ¶ 7 & Ex. A at 6.) Zeiss's former CFO Roberto Deger estimated OLE's G&A payments, which included expenses such as OLE's office rent and cost for auditing services, constituted approximately 10% of OLE's total spend. (Def. 56.1 ¶ 27; Pl. 56.1(c) ¶ 27; *see also* Def. 56.1 ¶ 24 (citing Wester Decl. ¶ 7 & Ex. A at 6; Deger Tr. 150:1-22).)

### ii.   *Operating Agreement*

Second, the Parties executed an Amended and Restated Limited Liability Company Agreement for OLE (the "Operating Agreement"), which required the Parties to each make an Initial Capital Contribution to OLE in proportion to each party's membership interest. (Def. 56.1 ¶ 12; Pl. 56.1(c) ¶ 12; Def. Ex. E § 3.01.) OLE's initial capitalization was $8,600,000: Zeiss contributed $4,472,000, or 52%, and Insight contributed $4,128,000, or 48%. (Def. 56.1 ¶ 14; Pl. 56.1(c) ¶ 14.) For any additional capital contributions, the Operating Agreement stated "[Zeiss and Insight] shall make additional Capital Contributions in cash, in proportion to their respective Limited Liability Company Interests." (Def. Ex. E § 3.02(a).) The Board was to determine whether these additional Capital Contributions were "reasonably necessary" and to provide written notice to Zeiss and Insight. (*Id.*)

The Operating Agreement states that the purpose of OLE is to continue work on the Zeiss Project by: (1) "facilitating the design, development and manufacture" of lasers for sale to Zeiss, its affiliates, or any third-party in the ophthalmology field and (2) "engag[ing] in any and all activities necessary or incidental thereto." (Def. Ex. E § 2.05(a).) Insight also granted OLE

4

exclusive intellectual property and other contractual rights arising from Insight patents and Insight's rights under the DSA, including the right to be Zeiss's supplier. (Def. 56.1 ¶ 13; Pl. 56.1(c) ¶ 13.)

### i.   Supply Agreement

Third, Insight, Zeiss, and OLE executed a Supply Agreement, which set forth the conditions by which OLE will "exclusively" supply Zeiss with lasers for ophthalmological uses (the "Supply Agreement"). (Def. Ex. G; Def. 56.1 ¶ 18; Pl. 56.1(c) ¶ 18.) The Supply Agreement, together with the Development Agreement discussed *infra*, collectively replaced the DSA. (Def. Ex. G at Recitals 7.)

### ii.   Development Agreement

Finally, Insight, Zeiss, and OLE executed a Development Agreement (the "Development Agreement") that set forth the terms and conditions by which Insight will "exclusively" develop lasers for ophthalmological uses for OLE "for integration into Zeiss' Products." (Def. 56.1 ¶ 16; Pl. 56.1(c) ¶ 16; Def. Ex. F. at Recitals 5 & 7.) Insight agreed to "use its best efforts to expeditiously complete development of the [lasers] in a stable, commercially saleable form" and to keep OLE advised on the development's progress and any material problems that arise. (Def. Ex. F § 2.1(b)-(c).)

The agreement also outlines the "R&D Payments" agreed to by the Parties, stating the following:

(a) <u>Development Costs</u>. The Parties acknowledge that prior to the Effective Date, Zeiss paid to Insight certain fees in connection with the development of the [lasers] as described in the DSA and the related SOWs (the "Initial Development Fee"). The Parties expect future costs of development and manufacturing startup of

the [lasers] through "Development included in JV funding" as set forth on Exhibit B hereto to equal, in the aggregate, eight million six hundred thousand dollars ($8,600,000) (the "Subsequent Development Costs").

(b) Overage. [Insight] shall be solely responsible for any costs and expenses in excess of the Subsequent Development Costs (the "Overage"). In the event that [Insight] has insufficient funds or is unwilling or otherwise unable to cover such Overage, Zeiss may elect to fund such Overage. For each two million five hundred thousand dollars ($2,500,000) in Overage funded by Zeiss, [OLE's] Managing Director (as defined in the LLC Agreement) shall amend the appropriate exhibit or schedule to the LLC Agreement to record Zeiss's receipt of an additional ten percent (10%) of one hundred percent (100%) of [OLE's] total outstanding membership interests as calculated at the time immediately prior to any such funding. In the event Zeiss provides less than two million five hundred thousand dollars ($2,500,000) in Overage funding, Zeiss' membership interest in [OLE] shall be adjusted on a pro rata basis ( e.g., if Zeiss provides one million two hundred fifty thousand dollars ($1,250,000) in Overage funding, Zeiss' will receive an additional five percent (5%) of one hundred percent (100%) of [OLE's] total outstanding membership interests as calculated at the time immediately prior to any such funding).

(*Id.* § 2.2(a)-(b).) Pursuant to the Development Agreement, Insight is solely responsible for funding any manufacturing and development costs exceeding the Subsequent Development Costs, or $8.6 million. (*Id.*)

### C.  Parties' Financial Contributions Under the 2017 Transactions

In total, the Parties contributed to following as part of the 2017 Transactions (Def. Mem. at 3):

(1) Zeiss paid $19,500,000: (i) $15,028,000 to purchase OLE from Insight as part of the Purchase Agreement and (ii) $4,472,000 (52% of $8.6 million) in capital contributions to OLE pursuant to the Operating Agreement.

(2) Insight paid $4,128,000 (48% of $8.6 million) in capital contributions to OLE pursuant to the Operating Agreement.

Consequently, Zeiss received majority ownership of OLE and OLE was capitalized with $8,600,000. *Id.* After their initial contributions of $8.6 million, Zeiss and Insight contributed no additional capital to OLE. (Def. 56.1 ¶ 21; Pl. 56.1(c) ¶ 21.) Since then, OLE has only received $71,675 in total: (1) $1,000 that Insight put into OLE when it formed the company; (2) $48,775 in interest; and (3) $21,900 that Insight loaned OLE so that, for example, OLE would not default on its equipment leases. (Def. 56.1 ¶ 22; Pl. 56.1(c) ¶ 22.)

### D.  The Development of the Zeiss Project

In their endeavor to achieve stable lasers that met the Development Agreement's specifications, Insight has devoted approximately $7,800,000 and 60,000 hours of developer effort. (Def. 56.1 ¶ 19.) Starting in the spring of 2019, when OLE's $8.6 million in funding was nearly exhausted, the Parties "spent considerable time discussing funding plans and associated budgets." (Pl. 56.1(b) ¶ 14 (citing Goldberger Ex. 14-19; Deger Decl. ¶ 12).) When the parties discussed the subject of fundings, Insight never once asked, inquired, or demanded that Zeiss contribute additional funds to cover the G&A costs—Insight never took the position that the $8.6 million was never fully funded or asked that an additional capital call be made to cover OLE's

costs and expenses. (Pl. 56.1(b) ¶¶ 18 (citing Goldberger Exs. 14-19, 22-25; Deger Decl. ¶ 12; Minneman Tr. 173:6-20).) Accordingly, by 2019, Insight no longer had the resources to continue development of the Zeiss Project, and work on the Project slowed substantially. (Pl. 56.1(b) ¶¶ 20, 23 (citing Ensher Tr. 77:11-80:17, 153-155; Deger Decl. ¶ 13).) By 2020, OLE had spent all $8.6 million in Subsequent Development Costs and could no longer pay Insight. (Def. 56.1 ¶ 28; Pl. 56.1(c) ¶ 28.)

To date, Insight has failed to achieve stable, reproduceable lasers meeting all the Development Agreement's specifications. **(**Pl. 56.1(c) ¶ 6.) From the outset, Insight immediately fell behind schedule on the Zeiss Project, and ultimately failed to meet any of the milestones outlined in Exhibit B to the Development Agreement. (Deger Decl. ¶¶ 7-8; Minneman Tr. 208:7-18, 214:6-23.)

## II.    PROCEDURAL BACKGROUND

Plaintiff commenced this action on September 17, 2020, alleging (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, and (3) contractual indemnification. (Compl., ECF No.  1.) On October 19, 2022, Plaintiff filed an Amended Complaint, alleging additional facts, amending the amount of alleged damages, and limiting the provisions of the Development Agreement Insight allegedly breached to Sections 2.1(b) and 2.1(c). (Amend. Compl., ECF No. 52.) On February 10, 2023, Defendant filed a motion for summary judgment seeking to dismiss all claims. (ECF No. 60.)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Whether particular facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . . ." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

**DISCUSSION**

## I.   BREACH OF CONTRACT

Plaintiff alleges Defendant breached two provisions of the Development Agreement: (1) Section 2.1(b) by failing to "use best efforts to expeditiously complete development" and (2) Section 2.1(c) by failing to advise Zeiss of its progress and any material problems with regards to the Zeiss Project. (Amend. Compl. ¶¶ 24-25, 43-43.) Defendant seeks to dismiss the breach of contract claim by arguing (1) Plaintiff has failed to prove the elements of breach for either provision and (2) cannot prove proximate damages. Plaintiff counters that the Court should deny the motion for summary judgment because there are genuine issues of material fact as to breach of

the relevant provisions of the Development Agreement and whether and to what extent Plaintiff suffered damages.

The Agreement is governed by New York law. (Def. Ex. E § 10.13.) "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank*, N.A., 632 F.3d 793, 799 (2d Cir. 2011). A court should only grant summary judgment "if the terms of the contract are unambiguous." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). A contract is ambiguous where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Id.* To the extent a party's summary judgment motion "hinges on ambiguous contract language," a court may grant summary judgment "only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Id.*

### A.  Plaintiff's Claims Based on Section 2.1(b)

Plaintiff alleges that Defendant breached Section 2.1(b) of the Development Agreement by "failing [to] comply with, or using its best efforts to comply with, the Schedule, including but not limited to failing to devote the resources and effort necessary to complete the development work." (Amend. Compl. ¶ 42.) Defendant claims it did not breach the Development Agreement because (1) its obligation to fund and devote resources to the Zeiss Project never arose because Plaintiff failed to satisfy a condition precedent in the agreement and (2) Plaintiff failed to put forth expert testimony to establish industry standards to assess whether Defendant used its "best efforts" in the development of the lasers.

A court tasked with interpreting a contract should seek "to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 157 (2d Cir.2000) (Sotomayor, J.). "Best efforts requires that the party obligated to use such efforts pursue all reasonable methods, and whether such obligation has been fulfilled will almost invariably involve a question of fact." *Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, No. 05-CV-6734T, 2012 WL 4891584, at *5 (W.D.N.Y. Oct. 15, 2012) (quoting *Robin Bay Associates, LLC v. Merrill Lynch & Co.*, 2008 WL 2275902, at *7 (S.D.N.Y., June 03, 2008); *U.S. Airways Group, Inc. v. British Airways PLC*, 989 F.Supp. 482, 491 (S.D.N.Y.1997)) (internal quotations omitted).

Here, there is a genuine issue of material fact as whether Defendant breached Section 2.1(b) of the Development Agreement because (1) Section 2.2(b) of the Development Agreement is ambiguous and (2) assessing whether Defendant used "best efforts" in the development of the lasers does not require expert testimony. Thus, the Court must deny summary judgment as to Plaintiff's breach of contract claim.

### a. *Breach of Section 2.1(b) Due to Lack of Resources and Funding*

In its breach of contract action, Plaintiff alleges that Defendant failed to use its "best efforts" for developing the Zeiss Project as required by Section 2.1(b) of the Development because Defendant "stopped working on the Zeiss Project in 2020 and has not devoted any resources to the project or done *any* work since then." (Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp.") at 13 (emphasis in original).) Specifically, Plaintiff alleges Defendant (1) "gutted" the resources allocated to the Zeiss Project by reducing the number of engineers working on the Project between 2017 and 2020; (2) prioritized its subsidiary's project developing lasers for

use in autonomous vehicles (the "LiDAR Project") over the Zeiss Project; (3) shifted resources, including funding, away from the Zeiss Project to the LiDAR Project; and (4) failed to perform any work on the Zeiss Project since 2019. (Pl. Opp. at 13-14; Def. Mem. at 10-11.)

In seeking to dismiss Plaintiff's claim, Defendant argues it did not "fail[] to devote any of its own resources to funding the project" as required by Section 2.2(b). (Def. Mem. at 7 (citing Amend. Compl. ¶ 35).) Insight alleges Section 2.2(b) of the Development Agreement obligated OLE to pay Insight $8.6 million for development and manufacturing startup costs, the Subsequent Development Costs, as a precondition to Insight paying "overage." (*Id.* at 7-10.) Only once OLE covered the $8.6 million in Subsequent Development Costs, Defendant reasoned, would Defendant become obligated to pay overage. (*Id.*) Therefore, Insight did not breach Section 2.2(b) and therefore could not breach Section 2.1(b) because OLE failed to satisfy contractual prerequisites for Insight to further fund and develop the Zeiss Project. Moreover, Defendant asserts it could not devote more resources and effort towards the development because this lack of funding prevented Defendant from employing more developers and contractors. (Def. Mem. at 12.)

Plaintiff, on the other hand, argues the plain language of the Development Agreement does not impose a condition precedent, lacking language such as "if," "on condition that," "provided that," in the event that," "subject to," et cetera. (Pl. Op. at 16.)  Plaintiff thus maintains Defendant had a clear obligation to fund the Zeiss Project and use its best efforts to complete it. Plaintiff asserts the Development Agreement is "at best" ambiguous as to the costs the initial $8.6 million in funding were intended to cover, thus summary judgment is inappropriate. (Pl.  Opp. at 17.)

The Parties agree that Insight had sole responsibility to fund any manufacturing and development costs exceeding the Initial Capital Contribution of $8.6 million. (Def. Mem. at 7-8; Pl. 56.1(c) ¶ 17; Pl. 56.1(b) ¶ 7.) Their disagreement, however, lies in whether the agreed-upon

$8.6 million in Subsequent Development Costs included G&A costs. (Pl. 56.1(c) ¶ 20; Def. 56.1 ¶ 20; Pl. 56.1(b) ¶¶ 6-7.) If so, as Plaintiff argues, then Insight was obligated to fund the Zeiss Project beyond the initial $8.6 million and use its best efforts to complete the Project. (Pl. Opp. at 16.) If not, as Defendant argues, then OLE failed to comply with a condition precedent of the Development Agreement, and thus Defendant had no obligation to contribute additional funding or resources to the Zeiss Project. (Def. Mem. at 9-12.)

Insight and Zeiss also do not dispute that a company's G&A costs constitute a distinct category of expenses from (1) research and development ("R&D") costs and (2) costs of goods sold, including manufacturing costs. (Def. 56.1 ¶ 23; Pl. 56.1(c) ¶ 23.) Plaintiff understood that the Subsequent Development Costs covered OLE's G&A costs. (Pl. Opp. at 18-19; Deger Tr. 148:2-19, 180:10-14, 185:13-15, 189:6-10; Deger Decl. ¶¶ 4, 6, 11; Pl. Ex. 39 at INSIGHT-054092.) Defendant, however, understood OLE's G&A costs were separate from development costs, and thus OLE had to pay G&A costs *on top of* the $8.6 million in Subsequent Development Costs. (Deger Tr. 148:2-19.) Accordingly, Defendant argues Plaintiff did not satisfy its payment to Defendant in full because OLE's G&A costs far exceed the $71,675 in additional funds OLE received after its initial capitalization, and OLE and Zeiss did not contribute any additional capital beyond the $8.6 million. (Def. Mem. at 9.) The Court thus must determine whether there is a genuine issue of material fact as to the Parties' funding obligations under the Development Agreement.

The governing contract language is ambiguous. The Development Agreement defines "Subsequent Development Costs" as "future costs of development and manufacturing startup of the [laser technology]." (Def. Ex. F § 2.2(a).) The definition of "Subsequent Development Costs" does not explicitly include OLE's general business expenses. (Def. Ex. F § 2.2(b).) However, a

person could reasonably conclude that the definition would encompass OLE's G&A expenses, as the Parties specifically funded OLE as a joint venture for the development of the Zeiss Project. The use of the word "startup" could reasonably include the costs of establishing the joint venture so that it could begin work on the Zeiss Project.

Moreover, Plaintiff cites competent extrinsic evidence of the Parties' intent that Subsequent Development Costs include G&A costs under the Development Agreement: (1) the initial $8.6 million in funding for OLE is equal to the amount of the Subsequent Development Costs (Pl. Opp. at 18); (2) the 2017 Transactions fail to provide a mechanism for accounting and funding G&A costs (Pl. Opp. at 18); and (3) Defendant did not raise the issue of Plaintiff or OLE providing additional funding, and even continued to indicate that it would provide additional funding (Pl. Opp. at 17; Pl. 56.1(b) ¶¶ 14-19.) As Plaintiff suggests and the evidence supports, Defendant seemingly understood that it had sole responsibility to acquiring funding for OLE after the Initial Capital Contribution. (Pl. Ex. 14-19 (OLE board meeting minutes dated May 2019, June 2019, August 2019, September 2019, April 2020 respectfully, where Insight representative reported to Zeiss representative updates on Insight's funding activities); Pl. Ex. 25 (OLE board meeting minutes dated March 2019 where Insight representative agreed it was now responsible for paying development costs under the Development Agreement).)

That said, the Development Agreement explicitly defines Subsequent Development Costs as costs of development and manufacturing startup. (Def. Mem. at 12.) As the Parties concede, G&A costs are typically expenses distinct from research and development costs and manufacturing costs. (Def. 56.1 ¶ 23; Pl. 56.1(c) ¶ 23.) Moreover, the Development Agreement itself indicates the funds are for "R&D Payments," which, although not defined in the contract, can be reasonably inferred to mean "research and development payments" based on the use of "R&D" later in the

contract. (Def. Ex. F § 2.2; *see also* Def. Ex. F. § 2.4, Developer R&D.) Therefore, it is also reasonable to conclude that the definition in the Development Agreement meant only to capture the costs of manufacturing and development as distinct from G&A costs. Because the definition of Subsequent Development Costs in the contract neither preclude the possibility of including G&A expenses, or support that meaning, summary judgment on Plaintiff's claim for breach of Section 2.1(b) is inappropriate.

### b.   Breach of Section 2.1(c) Due to Lack of Time and Effort

To the extent Plaintiff alleges Defendant breached Section 2.1(b) of the Development Agreement because Defendant did not devote sufficient time and effort to the Zeiss Project, Defendant argues Plaintiff failed to provide sufficient evidence to support its claim. (Def. Mem. at 12-14.) Defendant concedes that whether a party breached a best-efforts position is a question of fact for the jury. (Def. Mem. at 13.) Defendant maintains, however, that Plaintiff "must adduce factual and, when appropriate, expert evidence sufficient for a reasonable factfinder to find in its favor." (Def. Mem. at 13.) Specifically, Defendant alleges Plaintiff "disclosed no expert pursuant to Rule 26(a)(2) to establish industry standards for the development of advanced lasers or adduced evidence based on which a reasonable trier of fact could find that Insight failed to make best efforts." (Def. Mem. at 13.) Plaintiff, however, argues "the fact that the technology at issue in this action is complex is not relevant to whether Insight used its best efforts." (Pl. Opp. at 21.) The Court agrees with Plaintiff.

"It is well settled that expert testimony is unnecessary in cases where jurors are as capable as comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Automated Irrigation Controls, LLC v. Watt Stopper, Inc.*, 407 F. Supp. 3d 274, 297 (S.D.N.Y. 2019) (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d

32, 46 (2d Cir. 2004)). While the technology at issue is complex and technical, Plaintiff may prove

its claim that Defendant breached Section 2.1(b) without relying on expert testimony or evidence.

Plaintiff's claim that Defendant breached the Development Agreement is simple: Defendant did

not use its best efforts as required under the contract by failing to devote sufficient resources and

effort to complete the development work. Plaintiff provides considerable evidence in support of

this contention, none of which is particularly complex or difficult to comprehend: Insight

immediately began missing deadlines and failed to meet any milestones set forth in the Schedule

attached as Exhibit B to the Development Agreement (Pl. 56.1(b) ¶¶ 11-12 Deger Decl. at 7;

Minneman Tr. 208:7-18, 214:6-23); Insight reduced the number of employees at OLE from six in

2017 to one in 2019, and then down to zero in 2020 (Pl. 56.1(c) ¶ 21; Zahn Tr. 107:16-108:18;

109:15-17); Insight stopped making payments to Innolume, the vendor Insight used for fabricating

semiconductor chips, for work on the Zeiss Project (Zahn Tr. 284); Insight instructed Innolume to

substantially slow down work on the Zeiss Project (Zahn Tr. 266; Ensher Tr. 77:11-80:17;

Goldberger Decl. at Ex. 33; Rago Tr. 67:14-16); and Insight ultimately stopped funding the Zeiss

Project and by 2020, stopped doing work under the Development Agreement. (Pl. 56.1(b) ¶ 20,

23; Deger Decl. ¶ 13.) Moreover, Defendant admits it "lost interest in [the Zeiss Project] and was

focusing its efforts on its LIDAR business." (Def. Mem. at 11.) Therefore, a reasonable trier of

fact could determine whether Defendant breached the Development Agreement by failing to

devote sufficient resources, and such determination is not beyond a layperson's understanding.

*Automated Irrigation Controls,* 407 F.Supp. at 295 (finding that despite the complexity of the

technology at issue, expert evidence was not required for a reasonable juror to find whether the

defendant used reasonable efforts to promote the plaintiff's products).

Finally, the Court agrees that a contractual best efforts provision, as used in the Development Agreement, is distinguishable from a "commercially reasonable standard," like the one at issue in *Alto v. Sun Pharmaceutical Industries, Inc.* (Pl. Opp. at 21); *Alto v. Sun Pharmaceutical Industries, Inc.*, No. 1:19-CV-09758-GHW, 2021 WL 4803582, at *42 (S.D.N.Y. Oct. 13, 2023) judgment entered, No. 19 CIVIL 9758 (GHW), 2021 WL 4805430 (S.D.N.Y. Oct. 14, 2021)).  In *Alto*, the plaintiffs sued for breach of contract, including for the defendant's failure to "use commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable" to complete the transactions required under the contract. *Alto*, 2021 WL 4803582 at 40. The contract explicitly subjected the parties to an industry standard, specifically in the context of the pharmaceutical industry. *Id.* at 42. The Court thus declines to permit Defendant to retroactively impose a standard other than the one intended by the parties—the Development Agreement does not define "best efforts," and certainly does not apply an industry standard. (Def. Ex. F. § 2.1.)

   c.   *Plaintiffs' Damages Claims*

Defendant argues that Plaintiff has failed to prove damages because (1) Plaintiff paid $19.5 million in performance of the Purchase and Operating Agreements, not the Development Agreement at issue; and (2) Plaintiff failed to offer evidence of lost business or other costs. (Def. Mem. at 14.) Rather, Defendant alleges that OLE, not Zeiss, had to pay Insight under the Development Agreement. Plaintiff alleges that the three agreements are part of a "unified overarching agreement" as part of the 2017 Transactions. The Court agrees with Plaintiffs.

"Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993). Here, it is clear the three agreements are premised upon one another. The Parties signed the Operating Agreement to restructure their relationship following

Plaintiff's purchase of OLE under the Purchase Agreement, and the Development Agreement outlined the terms and conditions by which Insight would develop lasers for OLE. The Court would find it difficult, and accordingly does not try, to neatly untangle the Purchase, Operating, and Development Agreements, which Defendant and Plaintiff signed on the same day. The three agreements are "intertwined" and "component parts of a business transaction," where each depend on the other. *Id.* at 53. Accordingly, the Court will treat them as one. *Carvel Corp. v. Diversified Mgmt. Group, Inc.,* 930 F.2d 228, 233 (2d Cir.1991) ("[I]nstruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together.") (citations omitted). Defendant has therefore failed to prove that there is no genuine dispute of material fact as to whether Plaintiff suffered damages.

Undoubtedly, Plaintiff has also sufficiently alleged it suffered costs. "[A] party injured by a breach is entitled to recover damages that are the natural and probable consequence of the breach." *APL Co. PTE v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010) (citing *Bi–Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.,* 10 N.Y.3d 187, 192, 856 N.Y.S.2d 505, 508, 886 N.E.2d 127, 130 (2008)). Plaintiff alleges it suffered damages in the amount paid as part of the 2017 Transactions because Defendant "dissipate[ed] the development funds, prevent[ed] Zeiss from seeking alternative sources for the lasers, put[] Zeiss behind its competitors, and ultimately render[ed] its partnership worthless." (Def. Mem. at 14 (citing Def. Ex. K at 4); Pl. Opp. at 22-23.) This Court thus denies Defendant's motion for summary judgment on Plaintiff's breach of contract claim regarding Section 2.1(b) of the Development Agreement.

**B.  Plaintiff's Claims Based on Section 2.1(c)**

    a.  *Plaintiff's Claims Defendant Breached Section 2.1(c)*

Plaintiff alleges Defendant breached Section 2.1(c) of the Development Agreement by "withholding information from, or misrepresenting information to, Zeiss." Amend. Compl. ¶ 43. Defendant claims it did not breach this provision of the Development Agreement as to Plaintiff because information rights extended to OLE, not Zeiss. (Def. Mem. at 15.) Plaintiff rejects this argument with an inquiry: "Given that Insight was a minority member of OLE and Zeiss was the majority member, why would Insight have a duty to provide information to OLE, but not to Zeiss?" (Pl. Opp. at 23 (citing Def. Ex. F at Recitals 5 (stating that Insight will exclusively develop for OLE technology "for integration into Zeiss' Products")).) Plaintiff further points out that Zeiss funded the project and would ultimately benefit from the technology Insight was working to develop. *Id*. According to Plaintiff, "[t]o argue that Insight owed information duties to OLE, but not Zeiss, makes no sense either legally or factually, and cannot be what the parties intended when they executed the 2017 Transaction." (*Id*.)

The Court sides with Defendant. Section 2.1(c) of the Development Agreement is unambiguous:

> "[Insight] will keep [OLE] currently advised of the progress of such development, and any and all material problems encountered therein, the efforts being made to overcome such problems, estimates of completion dates, and such other information as may be requested by [OLE] from time to time."

(Def. Ex. F § 2.1(c).) The plain language of the contract requires Insight to provide information to OLE, not Zeiss. The only evidence that Plaintiff proffers in support of the Parties understanding that Zeiss would receive information alongside OLE is a statement from Zeiss CFO

Roberto Deger. (Deger Decl. ¶ 5.) In his declaration, Deger asserts that the Parties intended for Zeiss to have information rights under the agreement, and points to Section 9.14, "which provides for regular business review meetings between the parties." (*Id.*; Def. Ex. F. § 9.14.)

The Court, however, is unpersuaded. The Development Agreement explicitly references Zeiss throughout the agreement, including Zeiss's obligations and rights under the contract. As Plaintiff acknowledges, the Agreement states that the parties, Zeiss, OLE, and Insight, shall conduct regular business review meetings pursuant to Section 9.14. (Def. Ex. F § 9.14.) Other examples include: Zeiss has the opportunity to "thoroughly inspect, test, and otherwise evaluate" the technology prior to accepting it (Def. Ex. F ¶ 2.3(a)); Insight must provide Zeiss notice of any sales of the technology to ophthalmology companies (Def. Ex. F § 3.2)); Zeiss, but not OLE, may terminate the agreement for breach of any provision (Def. Ex. F § 8.2); however, OLE may terminate the agreement after notice of acceptance or rejection of the technology under certain conditions (Def. Ex. F § 8.4.) Further, as Defendant acknowledges, Section 2.1(c) of the Development Agreement specifically states the information-sharing Plaintiff is entitled to: "representatives from each Party shall meet by agreed-upon means at least monthly unless otherwise mutually agreed." (Ex. F § 2.1(c).) A reasonable trier of fact could not find that, under the plain language of the Development Agreement, both OLE and Zeiss are entitled to being advised of the progress of the Zeiss Project's development under Section 2.1(c).

Moreover, other than a few conclusory statements, Plaintiff fails to present evidence that Insight did not provide the requisite information to OLE pursuant to Section 2.1(c). (Pl. Opp. at 24 (stating "[t]he record shows that Insight hid information" without citing evidence).) The evidence Plaintiff does rely on only supports its allegations that Insight misrepresented information to Zeiss. (*See, e.g.*, Watson Tr. 213:5-221:8; 224:9-231:11 (discussing Insight's misrepresentations

about the status of the Zeiss Project); Pl. Ex. 13 (Insight employee admitting that Insight had told Zeiss the "same old stories" . . . "not founded in solid facts or data").) Plaintiff further fails to allege that each party's representatives did not attend monthly meetings pursuant to Section 2.1(c) or Insight otherwise violated Section 9.14 of the Development Agreement. Therefore, there is no dispute of material fact as to whether Insight violated Section 2.1(c) of the Development Agreement, and summary judgment for breach of contract for this claim is appropriate.

## II.    BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiff asserts the same arguments for its breach of contract claim. *See supra* Section I. Defendant argues that it is entitled to summary judgment on this claim because it is duplicative of Plaintiff's breach of contract claim. (Def. Mem. at 16.) Plaintiff points out a party may plead breach of the implied covenant of good faith and fair dealing in the alternative. (Pl. Opp. at 25.) While true, Plaintiff has failed to do so. Instead, Plaintiff relies on identical arguments for its claim for breach of the implied covenant of good faith and fair dealing as its breach of contract claim. The Court thus dismisses Plaintiff's claim for breach of the duty of good faith and fair dealing as redundant.

Under New York law, "every contract" implicitly includes "an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980) (citing *Kirke LaShelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (1933)). "Encompassed within this implied obligation are any promises which a reasonable person in the position of the promisee would be justified in understanding were included, and this embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Najjar Grp., LLC v. W. 56th Hotel*

*LLC*, 850 F. App'x 69, 72 (2d Cir. 2021) (citing *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995)) (cleaned up).

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same acts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005) (citations omitted).

Here, Defendant's alleged conduct giving rise to Plaintiff's breach of the implied covenant claim serves as a predicate for Plaintiff's breach of contract claim. In its Amended Complaint, Plaintiff relies on the same facts it based its breach of contract claim on to asserts its cause of action for breach of the implied covenant of good faith and fair dealing. (Pl. Amend. Compl. ¶¶ 46-51.) In alleging that Insight breach the implied covenant by "depriv[ing] Zeiss of the fruits of the [Development] [A]greement" (Pl. Opp. at 25), Plaintiff asserts the same underlying conduct in support of its breach of contract claim and seeks the same damages. Plaintiff's allegations that "Insight abandoned the Zeiss Project, it failed to fund the project, and otherwise failed to take steps to achieve the objectives under the Development Agreement" are the identical allegations it makes in support of its breach of contract claim. (Pl. Opp. at 25.) The Court thus must dismiss Plaintiff's implied covenant claim as redundant. *Creaven v. Erickson*, No. 22-874-CV, 2023 WL 4247213 (2d Cir. June 29, 2023) (dismissing plaintiff's implied covenant claim because it is based on the same facts as the breach of contract claim and plaintiff failed to identify a different basis for damages).

### III.     CONTRACTUAL INDEMNIFICATION

Finally, Plaintiff alleges it is entitled to indemnification because it is a Company Indemnitee pursuant to Section 5.4 of the Development Agreement. (Amend. Compl. ¶ 53-55.) As Defendant notes, Plaintiff's claim for contractual indemnification requires Plaintiff to prevail on its remaining substantive contract claim. (Def. Mem. at 5 n.2.) Because whether Plaintiff will prevail on its breach of contract claim remains unresolved, the Court cannot grant summary judgment as to Plaintiff's contractual indemnification claim. *See P&E Properties, Inc. v. United Natural Foods, Inc.*, 713 F. Supp. 2d 262, 267 (S.D.N.Y. 2010) (denying summary judgment for contractual indemnification claim as premature because genuine issues of material fact regarding plaintiff's breach of contract claim remained).

### CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment. Summary judgment is DENIED with respect to Plaintiff's breach of contract and contractual indemnification claims. Summary judgment is GRANTED with respect to Plaintiff's breach of the implied covenant of good faith and fair dealing, and the Court thus dismisses that claim.

The Parties are directed to appear for a telephonic pre-trial conference on January 26, 2024 at 10:00 AM. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest. The Clerk of the Court is directed to terminate the motion at ECF No. 61.

SO ORDERED:

Dated: November 21, 2023
      White Plains, New York

_____
      NELSON S. ROMÁN
      United States District Judge

23